

FILED
SEP 3 0 2010
UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

POSTED ON WEBSITE

NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
EASTER DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| In re<br><br>Thomas D. Hall,<br><br>      Debtor. | Case No. 09-10084-B-7 |
| Bank of America Practice Solutions, Inc. (formerly MBNA and Sky Financial Solutions, Inc.), an Ohio Corporation,<br><br>      Plaintiff,<br><br>      v.<br><br>Thomas D. Hall, fdba Thomas D. Hall, DDS, Inc.,<br><br>      Defendant. | Adv. Proc. No. 09-1072 |

**MEMORANDUM DECISION REGARDING MOTION
FOR SUMMARY ADJUDICATION**

This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

David L. Emerzian, Esq., of McCormick, Barstow, Sheppard, Wayte & Carruth, LLP, appeared on behalf of the defendant/debtor, Thomas D. Hall.

Michael Tudzin, Esq., of the Law Offices of Marlene Leiva, appeared on behalf of the plaintiff, Bank of America Practice Solutions, Inc.

This matter comes before the court on the defendant's motion for summary judgment and alternative motion for summary adjudication. The material facts are undisputed. In essence, prior to the bankruptcy, the debtor, Thomas D. Hall (the "Debtor") was a practicing dentist. The Debtor operated his medical practice through a corporation, Thomas D. Hall, Inc., (the "Dental Corp"). In 2008, the Debtor closed the Dental Corp. and put his patient records (the "Patient Records") in storage. Sometime later, he associated with another dental practice and began deriving income from the treatment of his former patients. The plaintiff, Bank of America Practice Solutions, Inc. (the "Bank") made a loan to the Dental Corp., which was secured by the Dental Corp.'s property (the "Collateral") and which the Debtor personally guaranteed. The Bank contends that its Collateral included the Patient Records and that the Debtor converted the Collateral, including the Patient Records, to his own use after he closed the Dental Corp. That question turns on whether the Bank held an enforceable security interest in the Patient Records before the bankruptcy commenced.[1] After reviewing the record, the undisputed evidence, and the arguments of counsel, the court is persuaded that the Bank did not have a security interest in the Patient Records.

This memorandum decision contains the court's findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a), made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 7052. The court has jurisdiction over this matter under 28 U.S.C. § 1334, 11 U.S.C. § 523, and General Orders 182 and 330 of the U.S. District Court for the Eastern District of California. This is a core proceeding as defined in 28 U.S.C. §§ 157(b)(2)(K).

///

---

[1] This motion was filed originally by the Debtor as a motion for summary judgment. Because of procedural defects in the presentation of the motion, it could not be granted. However, the parties agreed to submit the motion for summary adjudication of the limited issue described herein.

**Background**

Based on the record, the following facts appear to be undisputed. As a practicing dentist, the Debtor had a number of patients and maintained a file with the dental records for each of his patients. In 2006, the Dental Corp. borrowed $775,000 (the "Loan") from the Bank. As security for the Loan, the Debtor, on behalf of the Dental Corp., executed a security agreement (the "Security Agreement") whereby the Dental Corp. purportedly granted the Bank a security interest in the Collateral. The Debtor also executed a personal guarantee for the Loan. The Bank duly filed a U.C.C.-1 Financing Statement (the "U.C.C.-1 Statement") with the secretary of state.

Pursuant to the agreement between the Bank and the Dental Corp., monthly payments were due on the Loan. In March 2008, the Debtor suffered a heart attack and quit practicing dentistry. Also in March 2008, the Dental Corp. defaulted on the Loan. Sometime thereafter, the Dental Corp. closed and the Patient Records were placed in storage. In July 2008, the Bank filed a complaint in state court against both the Dental Corp. and the Debtor alleging causes of action for: (1) Breach of Contract; (2) Money Had and Received; (3) Account Stated; (4) Claim and Delivery; (5) Conversion; and (6) Unjust Enrichment (the "Complaint"). At that time, the Bank had not yet repossessed any of its Collateral.

In August 2008, the Debtor, on behalf of the Dental Corp., executed an agreement to acknowledge default and voluntarily surrender the Collateral. In this agreement, the Debtor, both personally and on behalf of the Dental Corp., agreed to be responsible for any deficiency remaining after disposition of the Collateral. In September 2008, the state court entered a judgment against the Debtor and the Dental Corp. in the amount of $811,857.74. The judgment was composed of damages, prejudgment interest, attorney fees, and costs. Additional relief was granted in the nature of: "Foreclosure on all property, personal and real, pledged as Collateral by [the Dental Corp. and Debtor] as set forth in the Complaint."

At some point during the Debtor's recovery from the heart attack he went to work for Adept Dental Practice ("Adept"). In addition, some of the Dental Corp.'s former staff also went to work for Adept. The former clients of the Dental Corp. were provided with the Debtor's contact information at Adept. As those patients came to Adept for treatment, their Patient Records were retrieved from storage and kept at Adept.

On January 6, 2009, the Debtor filed a chapter 7 bankruptcy petition. He listed his interest in the Dental Corp. on Schedule B with a value of 0. In June 2009, the trustee issued a report of no distribution. The Bank filed a proof of claim for $811,857.74 secured by "Assets of the dental practice," however, in connection with this bankruptcy case, the Bank has neither sought possession of any of the Collateral nor relief to do so. Neither has the trustee sought to abandon the Dental Corp. as an asset of the bankruptcy estate.

In April 2009, the Bank filed this adversary proceeding seeking a determination that its claim based on the state court judgment is excepted from the Debtor's discharge pursuant to § 523(a)(6).[2] The Bank's claim is based on, *inter alia,* the Debtor's alleged retention, transfer to Adept, and use of, the Patient Records.[3] Specifically, the Bank contends that the Debtor's use of the Patient Records to derive his personal income constitutes a conversion of its Collateral. The Bank's first claim for relief under § 523(a)6), pleads, in pertinent part:

> 30. With full knowledge of and in derogation of Plaintiff's rights, [Debtor], without just cause or excuse, intentionally and without just cause or excuse, first withheld returning the Collateral to Plaintiff, then transferred it to Adept Dental.

---

[2] The Bank also objects to the discharge in general pursuant to § 727(a)(2), (a)(4), and (a)(5). Those claims for relief are not addressed in this motion for summary adjudication.

[3] In response, the Debtor alleges that the Bank has already copied all of the active Patient Records and that it declined to copy the Patient Records which were in storage.

31. Notwithstanding Plaintiff's rights [Debtor] is and has continued to receive income from the Collateral which was pledged to Plaintiff. [Debtor], as President of [the Dental Corp.], has intentionally and without just cause *redirected income which constitutes Plaintiff's collateral to himself and others*, in conscious disregard of Plaintiff's Collateral and rights.

32. [Debtor's] conduct and acts amounted to conversion of Plaintiff's property, and a willful, malicious injury by [Debtor] to Plaintiff's to [sic] property and property rights, therefore, the indebtedness should be declared to be nondischargeable . . . .

First Amended Complaint, 8:8-20, emphasis added.

**Issues Presented**

The Bank's first claim for relief raises a number of difficult issues: Were the Patient Records part of the Bank's Collateral? Does the Debtor's post-petition income from the practice of dentistry and use of the Patient Records constitute conversion of the Bank's Collateral? While these are provocative issues, at the core is a single legal question: Did the Bank's Security Agreement, and the U.C.C.-1 Statement, create an enforceable security interest, under applicable nonbankruptcy law, in the Patient Records?

**Analysis and Conclusions of Law**

**1.     U.C.C. Security Interest in Collateral of the Dental Corp.**

In bankruptcy, an interest in property, such as a security interest, is usually defined by state law. *See Butner v. United States*, 440 U.S. 48, 54-57 (1979). Because one of the purposes of the California Commercial Code ("Cal. Com. Code") is to "make uniform the law among the various jurisdictions," the court may look to cases from other jurisdictions to interpret its application. *Needle v. Lasco Ind., Inc.*, 10 Cal.App.3d 1105, 1108 (1970).

The term "security agreement" means an "agreement that creates or provides for a security interest." Cal. Com. Code § 9102(a)(73). "A security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral . . . ." Cal. Com. Code § 9203(a). A security interest becomes enforceable against the debtor and third parties with respect to the collateral when

5

each of the following conditions is satisfied: (1) value has been given; (2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and (3) the debtor has authenticated a security agreement that provides a description of the collateral. Cal. Com. Code § 9203(b). It is undisputed that the Bank gave value for the Security Agreement and the Security Agreement was properly endorsed and perfected. The only issues disputed here are; whether the Security Agreement describes the Patient Records as Collateral; and whether the Dental Corp., possessed the ability to transfer a security interest in the Patient Records.

### A. The Bank's Security Agreement

In the description of its Collateral, the Bank's Security Agreement does not include the physical documents and files which constitute the Patient Records. Instead, in section 42, it refers to the *Dental Corp.'s interest in* the Patient Records.[4]

Division 9 of the California Commercial Code, applies to this transaction.[5] Although the Patient Records as tangible files may be moved about, nevertheless, it is not these paper or electronic files to which the value attaches, but the right of the Dental Corp. to derive a benefit from these records as part of an ongoing business. The benefit derived from the information in those records is a general intangible under the California Commercial Code. "'General intangible'" means any personal property, including things in action, *other than* accounts, chattel paper, commercial tort claims, deposit accounts, documents [defined as "document of title or a receipt"], goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction. The term includes

---

[4] It cites an interest in "all of Borrower's right, title and interest in and to all patient lists, files and records."

[5] With some exceptions, Division 9 applies to, "[a] transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract." Cal. Com. Code § 9190(a)(1).

payment intangibles and software. Cal. Com. Code § 9190(a)(42).

## B. Patient Records As Collateral

The Bank has not cited, and the court has not found, any relevant law which suggests that a physician's interest in the medical records of individual patients is transferable as collateral to secure a loan pursuant to Article 9 of the Uniform Commercial Code. Indeed, the Debtor's "interest" in the Patient Records was so restricted that it could not be transferred or assigned to the Bank in the traditional sense. This conclusion is supported by the substantial body of state and federal law surrounding the management of medical information. The Debtor's right to transfer and/or disclose any patient's medical information is strictly constrained by state and federal law and by professional codes of responsibility.[6] For example, the federal Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320, et seq., defines protected health information ("PHI") to include medical records. Essentially, HIPAA permits disclosure of PHI only between "covered entities," defined to include medical providers such as the Debtor.[7] Authorization is required for any other transfer of protected medical information.

The federal regulations implementing HIPAA provide that "covered entities" "may not use or disclose protected health information, except as permitted . . . by this subpart or by subpart C of part 160 of this subchapter." 45 C.F.R. § 164.502.

---

[6]The federal Health Insurance Portability and Accountability Act (HIPAA) provides significant civil and criminal penalties for unlawful disclosure of patient medical records. 42 U.S.C. § 1320d-5; d-6(a) and (b). California's Confidentiality of Medical Information Act (CMIA) Cal. Civ. Code § 56.10(a) prohibits disclosure of medical information by a medical professional unless the disclosure is compelled by court order, administrative order, subpoena, search warrant, or by the patient or patient's representative, or when otherwise specifically required by law. Section 56.10(b) provides substantial penalties for unlawful disclosure of records. Finally, the American Medical Association (AMA) Policy E-7.04, relating to the sale of a medical practice, conditions the transfer of patent records on patient notice and consent.

[7]45 C.F.R. 160.102(a).

The disclosure of such information to any other entity, except pursuant to narrow exceptions not applicable here, is conditioned on the patient's consent. 45 C.F.R. § 164.506(b)(a). The contents of such written consent are dictated, in great detail, by the regulations at 45 C.F.R. § 164.508(b). In order to transfer or assign the Patient Records, the Dental Corp. would have had to obtain the written authorization, in the form mandated by law, from each patient in advance. 45 C.F.R. §§ 164.501, 164.508; U.S. Dept. of Health and Human Services, Standards for Privacy of Individually Identifiable Health Information 25-28 (2003) (stating "covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list.") Here, there is no evidence that the Debtor obtained authority to convey any interest in the Patient Records to the Bank.

In addition to federal law, California's Confidentiality of Medical Information Act ("CMIA"), Cal.Civ.Code § 56.10(a) specifies that, "No provider of health care . . . shall disclose medical information regarding a patient . . . without first obtaining an authorization [with exceptions not applicable to this case]." Again, there is no evidence before the court to suggest that the Dental Corp. obtained authorization to pledge the Patient Records to the Bank as collateral for the Loan.

In light of the substantial and varied protections afforded in connection with the disclosure of medical information, and in light of the dearth of any authority whatsoever to the contrary, the court is persuaded that the Dental Corp.'s interest in the Patient Records was so conditioned and regulated by state and federal law, that the Dental Corp. did not have the ability to transfer a security interest in the Patient Records.

II.     **The Bank as a "Covered Entity"**

The Bank contends that Section 16 of the Security Agreement, in which it defines itself as a "Business Associate," permits it to receive PHI as a "covered

entity." Assuming, without finding, that the Bank qualifies under HIPAA as a Business Associate, it does not follow that the Bank obtained a security interest in the Patient Records.[8] Indeed, rather than describing rights to Collateral, Section 16 and the following sections comprise a contract, within the Security Agreement, which identifies the rights, obligations, and remedies of the Bank and the Debtor in connection with PHI, including the Patient Records. Section 16 of the Security Agreement acknowledges that the Bank does not have an exclusive right to possession of the Patient Records, indeed, the Bank must provide access to the Patient Records upon the Borrower's request for as long as the Bank has any of the Patient Records. Paragraph C states, in pertinent part: "In the event that Lender does receive Protected Health Information, Lender: (i) agrees not to use or further

---

[8]That section reads, in pertinent part: "B. The parties agree that Lender may receive Protected Health Information as a result of the Lender exercising its rights and/or remedies under this Agreement, or in the course of servicing the account of Borrower for the Indebtedness. Lender may use or disclose the Protected Health Information in the manner described or permitted in this Agreement, provided that such use or disclosure would not violate the Privacy Rule if done by Borrower, or as otherwise permitted under HIPAA. Lender may also use and disclose Protected Health Information for the proper management and administration of Lender or to carry out the legal responsibilities of the Lender, provided that, with respect to any disclosure, the disclosure is Required By Law or Lender obtains reasonable assurances from the person to whom the Protected Health Information is disclosed that it will remain confidential and will be used or further disclosed only as Required By Law or for the purpose for which it was disclosed to the person, and the person agrees to notify the Lender of any instances of which it is aware in which the confidentiality of the Protected Health Information has been breached. Lender may use Protected Health Information to provide Data Aggregation services to Borrower as permitted by 42 CFR § 164.504(e)(2)(i)(B). Lender may disclose Protected Health Information to Borrower's other Business Associates and may use and disclose Protected Health Information received from Borrower's other Business Associates."
"C. In the event that Lender does receive Protected health Information, Lender: (i) agrees not to use or further disclose Protected Health Information other than as permitted or required in this Agreement or as Required by Law; . . . . (iii) agrees to provide access, at the request of the Borrower, to the Protected Health Information in a manner that complies with the requirements under 45 CFR § 164.524."

disclose Protected Health Information other than as permitted or required in this Agreement or as Required by Law; . . . . (iii) agrees to provide access, at the request of the Borrower, to the Protected Health Information in a manner that complies with the requirements under 45 CFR § 164.524." In other words, the Bank is obligated to provide the Patient Records to the Debtor for his use in treating a patient. In addition, the obligations of the Bank and the Debtor under section 16 survive the termination of the Security Agreement[9].

Moreover, section 19, "Remedies on Default," makes clear the distinction between the Collateral, on the one hand, and the Patient Records on the other. Upon default, the Bank has the option of exercising any of its remedies including "to enter any premises where the Collateral may be located and take possession of and remove the Collateral." Upon the Bank's request, the Debtor is obligated to "assemble and to make available at a place designated by the Lender" the Collateral and the Bank can "sell, lease, or otherwise dispose of any Collateral or Security at public or private sale and collect any deficiency balance with or without resorting to legal process." However, in connection with PHI and the Patient Records, the Bank's rights are defined differently. The Bank *"may require the Debtor to assign and transfer custody of its patient medical and/or dental files, records, charts and/or lists to a duly licensed medical, dental or other health care practitioner selected by the Lender in its sole discretion, to execute such documents as Lender deems necessary to effect such assignment and transfer, and to turn over and remit*

---

[9]"F. Borrower and lender agree that termination of the Section is infeasible. Therefore, upon Borrower's knowledge of a material breach by Lender of this Section, Borrower shall notify Lender in writing of the material breach and provide an opportunity for Lender to cure the breach or end the violation."
"G." This section is between the parties hereto. Nothing express or implied in this Section is intended to confer, nor shall anything herein confer, any rights, remedies, obligations, or liabilities whatsoever upon any person other than Borrower and Lender and their respective successors and assigns. The respective rights and obligations of Borrower and Lender under this Section shall survive the termination of this Agreement."

*to lender the proceeds from any said transfer or assignment for value."* (Emphasis added.) Thus, under the Security Agreement, upon the Dental Corp.'s default the Bank had to take physical possession of its Collateral, the Dental Corp.'s personal property. However, the Bank did not assert any right to the *possession* of the Patient Records. Instead, the Dental Corp. had agreed to transfer the Patient Records to a "duly licensed" dentist selected by the Bank. In addition, if the Dental Corp. transferred or assigned "for value," it was obligated to turn over those proceeds to the Bank.

**Conclusion**

None of the cases cited by the Bank suggest that the Patient Records may be pledged as collateral. While the Bank is not required to attempt to liquidate its Collateral and may seek only a money judgment, the court is persuaded that the Patient Records are not the Bank's Collateral. The Dental Corp. did not possess the legal ability to convey such a security interest. Neither is the Dental Corps. *rights* in those records part of the Bank's Collateral. While the Bank and the Dental Corp. had a Security Agreement, guaranteed by the Debtor, which created a security interest in the personal property of the Dental Corp, the Security Agreement did not create a security interest in the PHI. The Security Agreement served as a contract between the parties in connection with the maintenance and transfer of the PHI in the possession of the Dental Corp. The Bank is really complaining that the Debtor breached the Security Agreement in some sense, and the Bank already has a judgment from state court for breach of contract.

Finally, the court is puzzled by the Bank's claims. It is unclear what the Bank's contentions would actually look like in real life. What did the Bank want the Debtor to do? Does the Bank argue the Debtor had a duty to continue to operate the practice until the Bank could find a buyer? Does the Bank contend that the Debtor should have turned away his former patients, directing them to call the Bank for their dental care? These conclusions are not sensible.

11

Based on the foregoing, the court finds and concludes that the Security Agreement and U.C.C.-1 Statement did not create an enforceable security interest in the Patient Records or in the Dental Corp.'s interests in the Patient Records. While the Debtor's continued possession and use of the Patient Records may have constituted a technical breach of the terms in the Security Agreement regarding the transfer of PHI, it did not constitute a conversion of the Bank's Collateral. Accordingly, the Defendant's motion for summary adjudication of that issue will be granted.

Dated: September 30, 2010

W. Richard Lee
United States Bankruptcy Judge